First case for the day is Brown v. Wal-Mart Stores, or cause number 19-60719. Mr. Kirchberg, why don't you proceed? May it please the court, my name is Jason Kirchberg, and I represent the appellant, Lashawnda Brown. Ms. Brown, formerly a 23-year employee at Wal-Mart, was terminated for allegedly violating Wal-Mart's policy regarding the detention and investigation of shoplifters, known as APO9. The alleged APO9 violation was reported by Ms. Brown's supervisor, Aurelio Quinn, to the market asset protection manager, Harry Hebert, approximately six weeks after Ms. Brown had reported Mr. Quinn for sexual harassment of other Wal-Mart employees. Mr. Kirchberg, on the timing of this, what was the most recent report by Ms. Brown in which you identified herself? I don't know how many of these reports were anonymous and how much were known. What was the most recent report prior to the incident at the store? It was April 4th, 2017. The incident in the store was, it's not entirely clear from the record. It's been indicated by the appellee as being May 9th. We have indicated it was May 12th. That was the date on which Mr. Quinn took statements from the employee. Let me ask you about the evidence in this case. We have some written statements, maybe one tied, mostly handwritten. Are those the statements, obviously deposition and affidavit, but are those statements the ones taken as part of the investigation? Yes, Your Honor. If you're talking about the statements, and I just have them in front of me in the record, the handwritten statement from Galen Carter, the handwritten statement from Nicole Rankin, and the typed statement from LaShonda Brown, and I believe a handwritten statement from Brooke. Those are the statements that Mr. Hebert- Is that the report? Do we have any evidence, any summary, or any narrative compared as part of the investigation by Quinn or somebody else? No, Your Honor, but what we do have was a telephone call from Mr. Quinn to Mr. Hebert immediately following the AP09 incident. At that time, Mr. Quinn testified that he gave Mr. Hebert all the facts of the incident. Based on the facts provided by Mr. Quinn, Mr. Hebert was prompted to respond, that's a bad stop. Now, Mr. Quinn- Yes, sir. That certainly has relevance, but my question really is, the reason for asking that really goes to, it seems to me what we're dealing with is how did, on your cat's paw theory, Quinn's motives, which there's strong evidence of what his motives may have been to affect Ms. Brown's career at Walmart, how did those affect the actual investigation and what went David? So we have these written statements, May 12th, or dates like that. If there were a written report as well, I think that would be relevant. And it seems to me what we're really looking at is what have you in this record that shows Quinn's had some effect on those written reports or on something else that falsified or distorted what went to Hebert? And is, I know you have the one example of the effort to try to get one of the witnesses to say that your client's the one that had the woman grabbed, shopper grabbed from the parking lot. What other evidence would you say that in these written statements or in some other way that the information that went to Hebert was affected by Quinn's motives? Your Honor, Judge Southwick, the evidence is that Mr. Quinn skewed the focus of the investigation on the front end, Ms. Brown. This was an investigation to a bad stop. On the front end, Mr. Quinn advised Mr. Hebert that Ms. Brown was the one who instructed Nicole Rankin to order the bad stop. Based on that information and putting Quinn in charge of taking the statements, determining who was going to give a statement, which by the way, the court Long versus Eastfield College at footnote eight indicated showed a lack of independence of the investigation focused on Ms. Brown. Then once the investigation failed to yield any evidence showing that Ms. Brown had ordered the bad stop, despite Mr. Quinn's best efforts, Mr. Hebert was primed based on what he had been told by Mr. Quinn to find a violation by Ms. Brown. He ultimately did not find Ms. Brown had violated AP09 for the bad stop. What he found was that Ms. Brown had improperly engaged with the customer. Now, we would dispute that AP09 as written prohibits the engagement as it's described in the record A, but B, more importantly, the engagement between Ms. Brown and the customer was nearly identical to the engagement between Mr. Quinn and that customer. Let me ask you about one of your items of evidence and you can correct me where this came from. But my understanding is exhibit 14 to your response to the motion for summary judgment is a written type, a type statement by your client. And she sets out the story of what happened. But she also says, once the woman came back in, though I think maybe there was more than one customer, ladies are referred to as customers. I looked at the buggy after they came back in, it was filled with bags of groceries that did not match the receipt in my hands that she'd gotten internally. Whatever kind of oversight is done, let's self-check if that's what this was. I asked the ladies, could I see their receipt? They pulled it out and began to cuss me a second. That itself, it seems to me is asserted by your friend on the other side to be a violation. Is that your client's statement? And is it that inconsistent, is it challenging and inconsistent with what she later said? And how do you respond to that? Your Honor, it is my understanding that that is her statement. And while it may not be inconsistent, it is certainly incomplete. We're looking at this incident in the cool light of later acquired facts. When we have to put ourselves in Ms. Brown's position, it's our understanding that her statement, which was expounded on by a deposition testimony and the written statements of other individuals who were involved in the AP-09 violation at the time and the statements they gave Mr. Hebert, this was a very volatile situation. The lady, the customer that came back in was screaming and yelling, approached Ms. Brown. Ms. Brown did ask for her receipt. She did it in an effort to calm the situation. Then Mr. Quinn came to the scene. He also looked at her receipt. He also looked at her bag. Moreover, he looked at her purse. I believe this exact deposition testimony is she even let me look in her purse. This customer, clearly irate, had no intention on leaving. Walmart is false to Ms. Brown because she said what she should have done was disengage and let the customer leave. The customer had no intention on leaving. In fact, she stayed for approximately 45 minutes. The majority of that time was with Mr. Quinn. And that, Your Honor, goes to show the circumstances, but it also goes to show the argument that Ms. Brown would make regarding pretext, that there was disparate treatment here. You had two salaried members of management that engaged with this customer in much the same way. However, it was Ms. Brown that ultimately received discipline based on a retaliatory investigation, which we will concede Mr. Quinn had to report. But what his motivation in reporting it was to have Ms. Brown fired. That's clear from all the evidence regarding retaliatory motives. Judge Kirschberg? Yes, Your Honor. This is Judge Higginson. I've got a little echo back, but I have three quick questions. Why would it be wrong to oversimplify this case to Ms. Brown admitted she knew it was a bad stop, and yet then in her deposition, she also admitted she told the customer she had several questions, and then she does acknowledge that she compared the receipt to the cart. So just based on her own admissions, why isn't that sufficient for Walmart to have terminated her just as they disciplined Galen and they disciplined Rankin? Your Honor, because the entire investigation into Ms. Brown, this was an investigation into a bad stop. She did not, Ms. Brown did not order or execute. Oh, I know, I know, but my specific question is she acknowledged that she knew it was a bad stop. She criticized Galen right as she approached, and yet then both the video and her own deposition confirmed that she chose to ask the customer questions and compared the receipt to the cart. If AP09 says not only can you not detain, but you can't investigate a suspect, it sounds like she knew it was a bad stop, but she made maybe a mistaken decision to then investigate herself. That's not what Quinn did. Your Honor, respectfully, we would submit that Quinn did, maybe not identically what Ms. Brown did, but substantially similar if by engaging, as Walmart has indicated, the customer like Ms. Brown did. Right, but I guess the difference that I see, and I'm just probing, is because this case to me has difficulties, but we don't know that Quinn knew it was a bad stop. I don't think that's clear in the record that when he comes to the commotion, he, like Brown, knew it had been a bad stop, and I don't think there was evidence that he then compared the receipt to the cart, so he didn't take steps that look like he still suspects the shoplifter. Am I wrong about those two facts? Your Honor, I don't know that there's anywhere specifically in the record that indicates that Quinn knew it was a bad stop. Well, however, Your Honor, I believe what the record indicates is that Ms. Brown was called to the front because there was a call to management. Yeah, I agree, and that sounds similar, disgruntled customer, but then she immediately, and to this day acknowledges, she said, that was a bad stop. You shouldn't have gone to the parking lot. But then inexplicably, she then says in her deposition, I said to the customer, hey, I've got some questions for you. That is correct, Your Honor. So why couldn't Hebert have just on that, why isn't that an independent basis? And related to that, you did, I think, state earlier that the record shows that Quinn told Hebert that Brown had ordered them to go retrieve the customer. Is that correct, or did I mishear you? I'm sorry, Your Honor, could you repeat that? When Quinn reports this incident, did he tell Hebert, the ultimate decision maker, that Brown had ordered that the customer be retrieved? Do we know that Quinn said that or not? Your Honor, we would submit that he did, and for a couple of reasons. Based on Quinn's testimony, on two portions of Quinn's testimony, he stated that after the AP-09 incident, well, he first calls his friend, Todd Javier. He was supposed to, according to AP-09, immediately call Mr. Hebert. He then, then Mr. Javier calls Mr. Hebert,  At this time, according to Mr. Quinn's deposition, he states that he gave Mr. Hebert the fax. Based on those fax, Mr. Hebert determines it was a bad stop. When then Mr. Quinn was questioned, well, what made it a bad stop? What fax made this a bad stop? He responds that LaShawn DeBrown ordered Nicole Rankin to stop the customer. Okay, so he not only tried to get Rankin to make that false statement, he specifically echoed it again to Hebert. The record bears that out? The court would have to make an inference to find such, which we believe is reasonable on summary judgment, but he did say two things are in his testimony. It's at the record at page 382, among other portions, because there's some duplicate portions of this testimony. But he does say that he, I believe the quote was, I broke it all down for Mr. Hebert. He then determined that's a bad stop, just like that, or he agreed it was a bad stop, something to that effect. Moments later, Mr. Quinn was asked in the deposition, well, what made it a bad stop? And Mr. Quinn responded, because LaShawn De asked Nicole to stop the customer. So it's our contention in this case, that the violation for which Ms. Brown was charged was a technical, this is a bad stop investigation, it required a technical reading of AP 09, that but for Quinn's retaliatory animus and influence on the investigation from the front end would never have even been analyzed. What would have been looked at were the circumstances leading up to the bad stop. What happened? Why were the elements not observed before this order was made by Nicole Rank and DeGalen Carter to bring this person back in? Ms. Brown acted in this circumstance, much like Mr. Quinn did. I know there is some slight nuances to that, but the whole of the evidence shows that it didn't make any sense if they were going to hold Ms. Brown liable. Mr. Hebert is clear in his affidavit that any violations of this policy are strictly implemented and it applies to all salary members of management. Mr. Quinn engaged with this customer for a very long time and his probing of the customer was much more involved than that of Ms. Brown. So it goes to disparate treatment, which goes to pretext in this. But when you talk about disparate treatment, did you offer any evidence as to Walmart not disciplining for an engagement and a questioning of a customer? In other words, exercising their discretion not to discipline when it's after the fact. Is there anything in the record to show that they didn't enforce this really strictly? No, Your Honor, there's not. But however, the court has to consider what a proper comparator is here. Ms. Brown is a member of management. She's a salaried member of management. Her functions are different than that of the individuals who were disciplined. They were hourly employees. So a more proper comparator to Ms. Brown's conduct would be that of Quinn. It would not be that of the employees. It's also notable that Nicole Rankin was terminated for ordering the bad stuff. She had one coaching, which as the court, I'm sure is aware, is Walmart parlance for discipline. And Mr. Quinn had told her, according to her affidavit, that if she didn't lie and say that Ms. Brown had ordered the bad stuff, that she would be terminated. And in fact, she was terminated, even though she only had one coaching on her record, whereas Galen Carter was given a coaching. And in effect, what happened to Nicole Rankin was she was terminated, given what would in effect be- So to my eye, the record is full of evidence that shows that Quinn may or indeed was determined to be disreputable. That's really still, though, not our question, right? Aren't we asking whether there was evidence that this investigation and termination was independent of his cat's paw influence on A. Bear? That's what we're looking at. Is there a material issue of fact as to that? Yes, Your Honor, we believe that there is. And it really comes down to the three items that we've been talking about today. It's on the front end, Quinn skewing the focus of the investigation from those that executed and ordered the bad stuff to Ms. Brown, who came and acted as Quinn acted after the fact, A. B, it was Mr. Quinn who was the one who conducted the investigation. It can't be said to be an entirely independent investigation when Mr. Quinn was the one conducting it. Had this been a truly legitimate- Well, just because your time's running out, what's your best cat's paw case when you have that amount of involvement of the allegedly biased supervisor? What's your best cat's paw case that you can think of, any circuit that's equivalent to get you past summary judgment? Your Honor, admittedly, there's nothing that squares off of this case on the fact. Your Honor, though, I would love to long be at Eastfield College. I would also look at Gee versus Principi. In both cases, the court determined that the level of influence by the supervisor or the retaliatory animus, the level of that influence on the decision-maker is an issue of fact, not correctly decided summarily by the court. Mr. Kirshenberg, let me ask you a quick question. Your client worked at Walmart for 23 years. Did she have a history of having any other coaching problems before she worked with Mr. Quinn? Your Honor, that is correct. She was at Walmart for 23 years. The record only reflects three coachings within the 12 months prior to the AP09 investigation. Prior to that, she was an employee that rose through the ranks from an hourly cashier to become a manager. There are no other coachings in the record. Okay, thank you. Counselor, your time is up, but let me extend it just a bit with apologies to all involved in this video. It seems to me your principal, I shouldn't say that, but one of your principal arguments is that the investigation was distorted, whatever word you wanna use, by Quinn's being put in charge of it. Looking at the investigation itself, not things that occurred before the investigation, what Abe Bear was told at the front end, whatever, what is different in the statements that were obtained through Quinn's endeavors that you're saying were incorrect? What is in those statements that Abe Bear considered that you are saying are incorrect?  of what is in the statement. However, what we would argue is that the facts as they exist, as we know them, show that holding Ms. Brown liable or charging her for this AP09 investigation, given those facts, doesn't make sense given that Mr. Quinn engaged in the same behavior. And the only reason that this technical reading of AP09 was done by Mr. Abe Bear to so discipline Ms. Quinn was because he was primed from the outset to focus the investigation and basically found any reason he could to hold, to give Ms. Brown a coaching result in her termination. That is the primary. All right, Captain. Thank you. All right, Ms. Wrigley, good morning. Here we go. Okay. Sorry about that. Had to unmute myself. Still getting accustomed to proceeding with just about everything via Zoom these days, as I guess you all are as well. But thank you. This morning, I wanted to just touch on a few things that Mr. Kirschberg mentioned during his argument. And the first place that I'd really like to direct the court's attention is to a summary in an email that Mr. Abe Bear prepared on May the 16th. It is at the record at 196. And even though it's not a formal report, it does summarize Mr. Abe Bear's findings as they concern the investigation that he conducted. And it speaks to his recommendation for the accountability for each associate that he sought approval from his superior and that she approved. And then they, through Mr. Quinn, he was the floor manager, executed on Mr. Abe Bear's recommendations. And as it concerns Ms. Brown, the appellant specifically, he recommended that she go to a next level coaching. Walmart uses a progressive disciplinary, or at least at the time, a use of progressive disciplinary approach on holding associates accountable. And because Ms. Brown had an active third written coaching from June 2000- Ms. Wrigley, I'm just gonna interrupt you because I think we do know her situation and how this one was the third strike, but isn't the question before us, whether or not there's a material dispute of fact that Quinn influenced the termination, or in fact, it was a product of an independent investigation. If that one, that's how I assume the framework is before us. And if that's true, how could there not be a material dispute of fact if he's the one that reports the incident that leads to her firing, then he's the one that is said to be the investigator. He collects all witness statements. We have Rankin's evidence that when he's collecting statements, he's trying to get the witnesses to lie and falsely accuse her. And then he's the one that tells her she's in fact terminated. All of this is within weeks of him knowing that she made a complaint against him. To me, that suggests he had not only motive and extraordinary opportunity to influence this outcome. That said, so why am I wrong factually as to any of those abilities to have complete control over the investigation as opposed to it being an independent investigation? Sure, of course. So I think for purposes of this argument, Judge, you're correct. We have to assume that he had the requisite retaliatory animus, but for a cat-call theory of causation, it's not just animus that's at issue. It's also the influence. What level of influence did he exert, was he able to exert over the process? As Mr. Kirschberg has already acknowledged, Mr. Quinn didn't have a choice on whether he could or could not report the AP-09 violation. The policy required him to do it. That's what he did. To the extent he offered some incorrect information, that Ms. Brown is the one who initiated the bad stop, the fact that Mr. Hebert's investigation did not reach that finding, as is illustrated in the email that I directed the court's attention to a moment ago, I think that piece of evidence is critical to establish the independence of Mr. Hebert's investigation. He didn't- Okay, stop right there. So wait, what is the email that establishes there was an independent investigation? Remind me, how do we know from an email that this was independent of Quinn's involvement? It is, Mr. Hebert sent an email summary of his investigation to his superior on May the 16th. It is found at page 196 of the record. And he notes in his finding there that it was Ms. Rankin that initiated the, or that she instructed the associate to go out into the parking lot to retrieve the customer. And that Ms. Brown, all that Ms. Brown did to violate the policy was to continue to engage the customer and ask for the customer's receipt. So to the extent Mr. Quinn provided some false information at the front end of the investigation, Mr. Hebert did not blindly rely on that information. In fact, his investigation, his independent investigation revealed that that's not what occurred. And he made a recommendation based on the investigation that he conducted. As to the statement, Mr. Quinn merely performed the administrative function of collecting statements from the associates that were involved in the bad stuff on May the 9th of 2017. Maybe he tried to persuade Ms. Rankin to falsify the information that she included in her statement, but her declaration, which was submitted as the record at the summary judgment stage, notes that she refused to falsify the information. There's nothing in the record to suggest this or to stop with. Ms. Wrigley, let me ask you about that. I look at the email that you're talking about and it's been my understanding that the idea that Ms. Brown is the one who caused the shopping to be brought back in is really out of the picture by the time they've made his decision and recommendation that then went up to his supervisor. It seems to me what's going on here is just what Judge Higginson is summarizing, is there's an extraordinary amount of evidence that Quinn wanted to see Brown punished and terminated on summary judgment. I think that evidence is there and there's really not much rebuttal to it. And ultimately the complaints that Brown had seem to have been proven in the actions and at least he acted that way to a later instance. So, and so far as Quinn's role in this, it's very troubling. And you have somebody with that kind of animus involved in the investigations problem. And you also have the evidence of one distortion that he tried to do and failed, which makes the rest of it somewhat suspect. But to what extent, and we're looking at reasonable inferences of all read in the light, most favorable to the party opposing summary judgment, what keeps that inference in your mind of the investigation itself being effective by Quinn's animus from preventing summary judgment from being upheld on appeal? Yes, your honor. So the statements at issue, there's nothing in the record to suggest that those statements lack credibility, that they're untrue, that they're inaccurate. And Mr. Hebert relied on those statements and- There, that's my point. Why isn't there something in record to cause those into question? Because we know that the chief investigator who's making statements tried to get false statements. Well- We don't know about the falsity of any but one. Does that remove the concern about the rest? No, your honor. And in fact, I believe that Ms. Rankin's statement, her contention that she was persuaded to include false information and then didn't, that that should allow the reasonable inference to be drawn, that all of these statements are credible. I mean, ultimately, if there was an issue about the credibility of any of the statements, then the evidence should have been put before Judge Girola at the district level to call those statements into question. But it's- Does Mr. Hebert's deposition notice, I don't guess it was taken. There was no deposition of Hebert? No, your honor. Okay. Thanks. And then the other component of Mr. Hebert's investigation that I believe illustrates that it was independent and without the bias of Mr. Quinn is the video. He watched the video footage that was captured. That was not adulterated in any way. At least there's no argument by the appellant that it was. And it demonstrated that Ms. Brown, in addition to the other associates who were held accountable, that they violated AP09. The degree to which they violated the policy was different. And that's why Ms. Rankin was held more accountable than the other two associates who were just, where he recommended that they just move to the next level of the policy. So is the video even in the record? It's not, your honor, but nobody disputes what the video shows as it concerns Ms. Brown. And that is that when the customers returned to the store, she engaged them, she asked for the receipt, and then she compared the receipt to the items in the buggy. Did the customer request to speak with Mr. Quinn? The record reflects that the customer, after being interrogated further by Ms. Brown, that she asked to speak to a manager. And at that point, Mr. Quinn came over and responded to the customer in an attempt to deescalate the situation. He did spend time talking to the customer, but there is no evidence in the record to show that he engaged in similar conduct as Ms. Brown. First, there's nothing in the record to suggest he knew really what was going on. He just responded to somebody calling him over. He realized that there was a tense situation occurring. He took steps to try to deescalate that. He did testify that he looked into the customer, that he looked at the customer's purse, and he looked at the receipt. There's nothing in the record to show that he asked the customer to do those things. It's very plausible that in an effort to deescalate the tension, that the customer said, look at my purse, look at my buggy. I didn't steal anything. Wait a minute, so the record shows, I guess I wanna know about two things. The record shows that he too looked at the receipt and the cart just as she did? The record shows that he testified in his deposition that the customer gave him the receipt. It doesn't indicate whether he asked to see the receipt, which is the issue. So that's what Walmart is distinguishing. She violates AP 09. She shows up, everyone agrees, both of them show up after the bag stop retrieval of the customer. So the question is, she becomes a target and gets terminated. He becomes the investigator who tells her she's terminated. They're both there at the same time. They both compare cart and receipt, but the distinction under this policy is that the customer gave him that stuff whereas she asked for it. Is that really what it comes down to? No, Your Honor. I don't believe that the record indicates that these things would have been part of Mr. Hebert's investigation. He looked at, when he looked at the CCTV footage, it reflected that Ms. Brown had engaged in the conduct as we already discussed. No, no, no. Don't just say we already discussed. What exactly did she do that violates the text of the policy? Yes, Your Honor. So when the customer came back in, instead of directing the customer, apologizing for the inconvenience and sending the customer along her way, Ms. Brown looked into the buggy, she observed that there were numerous pieces of merchandise in the buggy, and she said that when you have items in your buggy and you have a receipt that doesn't reflect that many items, I'm gonna look at your receipt and I'm gonna have some questions. And that's different from what Mr. Quinn did. To the extent he looked at the receipt, to the extent he looked into the purse, it's not, it's not adduced to the record that he asked to do those things that he engaged in further proceedings. Okay, so I guess I am right then, that the violation, she becomes terminated, violated under the policy, he becomes the investigator that tells his jury, it's the difference is she asked to look and he, you say, was given the same items and did look. That's the difference. As an initial point, I would disagree with the assessment that Mr. Quinn was the investigator. I mean, his function in this was ministerial. He collected statements from the associates who were involved at the direction of Mr. Hebert, and Mr. Hebert reviewed those in the surveillance footage, and he ultimately is the one who investigated. Well, did anyone else collect any statement other than Quinn? No, Your Honor. No. And when you then toss in, no, well, Hebert looked at the surveillance, we know the surveillance isn't even in this record. So it sounds to me like he was the only conduit for information getting to Hebert. Who else is a conduit? Where does it say there was anyone else gathering any evidence that's in the record? Sure, so as far as the statements go, I think that categorizing Mr. Quinn as a conduit, so to speak, and that he was the one who facilitated providing those statements to Mr. Hebert, but the surveillance footage really doesn't require a conduit. It is, and I recognize that it's not as part of the record, Your Honor, but there's no dispute about what the surveillance footage reveals as it concerns Ms. Brown. And so Mr., I mean, we can't deny that Mr. Quinn was involved in a purpose quarrel. I wish personally that he had not been involved, but that does not take away from the credibility of Mr. Hebert's investigation, which he conducted, which he at least reviewed the components that are not in dispute in terms of accuracy and credibility. He reviewed the statements and he reviewed the surveillance, and he's the one who made the decision that the AP-09 violation had occurred. Is there some allegation that Mr. Quinn and Mr. Hebert were friends, had a good relationship? No, Your Honor, the allegation, I believe, is that Mr. Hebert, excuse me, Mr. Quinn was friends with the market manager, Todd Javia, and that somehow that may have worked to influence the investigation. It's really more speculative. There's not evidence that actually supports that allegation. The allegation is made at various points in the briefing at the summary judgment level and at the appellate level. Okay, thank you. And also, on one of the points that you've been discussing a fair amount of what Brown did with the customer, I had mentioned to you where the opponent of what Exhibit 14 to the opposition to summary judgment said type statement from Ms. Brown that indicated that she asked for the receipt. Her deposition says the opposite. Does it not that the, that maybe opposite's too strong a word, but that the customer showed her the receipt as her defendant, which sounds quite reasonable to me, somebody being brought in that's not even paid for anything. The customer might wanna show the receipt to the complaining party. Isn't that a disputed fact that despite that it's Brown herself who made that type statement? Is it disputed whether she asked the customer for the receipt or the customer offered it? No, Your Honor, I don't believe it's disputed. One, as you touched on, Exhibit 14 to the, in the motion for summary judgment briefing, she acknowledges that she asked for the receipt. Every witness who provided a statement acknowledges that she asked for a receipt. And then Ms. Brown at her deposition testified that she asked for the receipt when she said along the lines of, well, when somebody comes in with a, you know, a buggy full of merchandise and a receipt that only has a few items, I'm gonna ask for the receipt. I'm gonna ask some questions. And so it's not, to the extent there is a, you know, having the benefit of hindsight, she tries to crawfish out of her earlier statement. You know, to the degree that has occurred, it is not enough to create a disputed fact, at least one that's genuine enough to warrant the reversal of Judge Barola's decision to correctly dismiss this matter on summary judgment. And then you are getting back to Judge Higginson's point, which is this whole thing turns on whether she asked for the receipt or not. Well, yes, Your Honor. And, but Ms. Brown admits that she, she admits sufficiently in her deposition and then in her initial type statement that she asked for the receipt. So if she tries to soften, soften that position down the line, that's not enough to create a, you know, a genuine dispute given the weight of the evidence to demonstrate that she in fact asked for the receipt, that the surveillance footage revealed that she was engaging the customer and the other statements that were collected that, you know, the accuracy of which is not questioned. Have you, have you cited to us any precedent, you don't have to agree with my characterization, any precedent that applies to this case in which the independent, in which the investigation that then goes to the decision maker is, is potentially handled by the person who was trying to retaliate, the person that's trying to use a supervisor as cash pawn. Do you have any case in which that is a factual situation? Your Honor, I don't know that one, to borrow Mr. Kirchberg's phrasing, kind of squares up quite like that with our case, but we do cite the cases that show what is sufficient evidence. I mean, starting with Judge Clement's opinion in- We've seen the cases, but I want to know if there's any that you identify in which, with all due respect to your position, but as we discuss this among ourselves, in which the investigation itself seems tainted by the biases of the investigators. But- I'm sorry, Your Honor. Do you have a question like that? The cases that come to mind to respond to your question, really respond to it in the opposite. Cases that reflect that, where there was sufficient evidence. And we just, for the most recent one in them, Melvin versus Barr looting case, which is one of yours from earlier this year, Judge Southwick, where the supervisor at issue, they really went to great lengths to kind of trump up an issue that he reported to the vice president of the company that resulted in the termination of the employee. But one thing I would like to just emphasize with this case is we are relying, we have to use the but-for theory of causation here, even though that this is a catfall case. And but-for, we can't say that but-for Quinn report to Mr. Hebert, the adverse employment action issue would not have happened because it still leaves an AP09 bad stop made by multiple employees. That information could have still made its way to Mr. Hebert. And even if Quinn had not been involved, the fact that Ms. Brown nevertheless engaged in misconduct under the policy, that ultimately was the but-for, the but-for cause of her termination was her own misconduct. And could you just speak quickly to the two cases he cited as his best ones right at the end? Yes, Your Honor. So with the, and I might not pronounce this correctly, but the Yee versus Principe case, we distinguished that case in our briefing that, and so I was obviously in the interest of time to further there. And I cannot find my note that indicated the name of the other case that, that the Long versus Eastfield College, I'm sorry. And that case is distinguishable because, let's see. Well, I'll look at it. Sure. It boils down to the independence of the investigation. And we contend here, as I know you've heard me argue that this one was independent. There are some optical issues we recognize, but ultimately there's not sufficient evidence that Mr. Quinn influenced the process enough to warrant our reversal of the decision on summary judgment. All right. Mr. Kirchberg, you have anything to add? You are muted. I'm sorry. Brave New World. We sympathize. Yes, Judge Southlake. First, just a brief housekeeping matter, so to speak. Ms. Wrigley had indicated that there was no evidence that Mr. Quinn knew what was going on. But in the record, that's simply not true. Ms. Brown, in her deposition, stated that when the customer asked to see another manager, and by the way, Ms. Brown herself was an assistant manager. She said, well, he's right here. He was standing, she testified Mr. Quinn was standing behind observing the whole incident. So he knew what was going on. He was standing right there. And to the extent that that is disputed, it's a disputed issue of fact that should be determined by a jury. Another point, Your Honor, had this been an independent APO 9 investigation, a legitimate APO 9 investigation, Mr. Quinn would have never been involved in. He would have been giving a statement. They would have had an individual that wasn't a fact witness. Mr. Quinn saw what was going on. He had information that was relevant. The fact that they put him in the driver's seat to determine who should give a statement and then receive the statement from them shows and underlong the Eastfield College it was not an independent investigation. But I also wanna briefly in my last minute to talk about what the district court found. The district court dismissed this case on the finding that Ms. Quinn had showed no evidence of influence on ABEARS, no evidence. As we discussed during argument today, there is evidence. I believe the court was just wrong on that. And such evidence calls into question the independence of Mr. ABEARS' decision-making process. She and Long both state that the amount of influence that the retaliatory animus played on the investigation is an issue of fact, not proper to be determined on summary judgment, given the clear evidence of Quinn's retaliatory animus and the evidence that he had influence over the investigation, which by the way- Counselor, it seems to me the main influence and perhaps the only influence you're really talking about is she did all these things that were in violation of which basically is engaging in this sort of inquiry rather than just sending the customer on away. So she did violate AP-09. It seems to me the main argument on some sort of influence is that Quinn himself was equally guilty and so we got comparative problems and whatever else. But where is the influence on the information that went to ABEARS as opposed to ABEARS not also recommending Quinn being equally similarly treated? Well, Your Honor, first, we do not concede that Ms. Brown's behavior was a violation of AP-09. Why AP-09 talks to prohibiting approaching a customer, it's not clear that it prohibits engaging and the evidence of that is the fact that Mr. Quinn was not also disciplined. Further evidence of that is that Mr. Quinn felt that he needed Nicole Rankin to lie in order to have Ms. Brown disciplined by telling ABEARS falsely that it was Ms. Brown who ordered the bad stuff. So Mr. Quinn apparently didn't believe that Ms. Brown had engaged in behavior that violated AP-09. Judge Southwick, can I ask one question? Two questions, Judge Southwick? Three questions, go ahead. Two, two, two. One is, just again housekeeping, in your brief on page 23-24, you state that Quinn told Brown she would be fired immediately after the incident. Is there any record support for that? Your Honor, I believe it's in both Mr., I know it's in Mr. Quinn's deposition. It's not a model of clarity, that discussion, but I can't recall the exact page number, but that's where that primarily comes from. Okay, and then the only other question I had was, how would you tell us we should use the ABEARS deposition statement that he relied on a video that's not in the record? What is the significance of the video not being in the record? Your Honor, the fact that he can't comment on what the video shows if it's not in the record, A, B, I believe Ms. Wrigley is correct. There's not much dispute as to what it would show. Okay, thank you. All right, counsel, we appreciate your time and again, working with us as we try to keep the cases moving and give your clients the best result that we can.